THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* LUCY HAGENOW, Plaintiff in Error.

*Opinion filed October 26, 1908—Rehearing denied Dec. 3, 1908.*

1. CRIMINAL LAW—*exception to rule precluding proof of other crimes than the one charged.* The rule precluding evidence of distinct crimes other than the one charged in the indictment is subject to the exception that where it is necessary to show guilty knowledge or a particular intent to establish the offense charged, proof of other offenses by the defendant of the same character may be introduced.

2. ABORTION—*proof that defendant was a professional abortionist is competent.* Since it is necessary, in a prosecution for murder by producing an abortion, to prove that the abortion was not necessary to save the mother's life, the People may prove that the defendant advertised in the daily papers as an expert of long experience in treating pregnant women by painless methods, without operations; that for many years she had been engaged in the business of producing abortions; that she kept a place for treatment of such cases and that she had caused abortions upon several women which resulted in their death. (*Scott* v. *People,* 141 Ill. 195, and *Clark* v. *People,* 224 id. 554, followed.)

3. SAME—*when statement in form of dying declaration is admissible.* In a prosecution for murder by producing an abortion, a statement by a former victim, in the form of a dying declaration, charging the defendant with producing an abortion upon the declarant several years before the commission of the crime charged in the indictment, which statement was read aloud in the presence of the defendant at the time it was made and its charges not denied by her, is competent as an admission tending to show the defendant's connection with the death of the declarant, and as tending to show the particular abortion charged in the indictment was not necessary to save the mother's life.

4. EVIDENCE—*evidence admissible for any purpose should not be excluded.* Evidence which is admissible for any purpose should not be excluded, but it is proper for the court, by an instruction, to limit such evidence to the proper office in the case.

5. SAME—*admissibility of opinions of physicians who made the post mortem examination.* Physicians who made the *post mortem* examination of the body of the woman whose death by abortion the defendant is charged with having caused, may testify as to the condition in which the organs of the body were found and may give their opinions as to the cause of death, and also their opinions as to how the ruptures and lacerations of the uterus were made.

6. INSTRUCTIONS—*when omission of element from instruction will not reverse.* The fact that an instruction in an abortion case, in stating the facts necessary to be proven to entitle the People to a conviction, omits the element that the deceased was pregnant is not ground for reversal, where the instruction does not direct the jury to find the defendant guilty if they found the facts stated to be true and where the omitted element was included in other instructions.

7. SAME—*when refusal to give jury form of manslaughter verdict is not error.* If the evidence in a prosecution for murder by producing an abortion is such that it clearly shows the defendant, if guilty at all, to be guilty of the crime of murder, it is not error to refuse to give to the jury the form of a verdict for manslaughter, even though the jury have the power, and were so informed, to find the defendant guilty of manslaughter under the indictment.

8. TRIAL—*when conduct of State's attorney will not reverse.* The facts that the State's attorney stated to the jury that the defendant had publicly and notoriously been engaged in the business of murder in the city of Chicago for years and urged the jury to send her to the penitentiary for life, and that he asked the defendant, on cross-examination, if the pictures of the women who were dead did not sometimes come to her, are not ground for reversal, where there is competent evidence that the defendant was a professional abortionist and had caused the death of several women.

SCOTT, FARMER and VICKERS, JJ., dissenting.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. A. H. CHETLAIN, Judge, presiding.

JOHN C. KING, JOSEPH R. BURRES, and JAMES D. POWER, for plaintiff in error:

The court erred in admitting evidence with reference to offenses not connected with the offense charged in the indictment. *Farris* v. *People,* 129 Ill. 521; *People* v. *Lonsdale,* 122 Mich. 388; *Baker* v. *People,* 105 Ill. 452; *State* v. *Lapage,* 57 N. H. 245; *Shaffner* v. *Commonwealth,* 72 Pa. St. 60; *People* v. *Molineux,* 168 N. Y. 264; *Rosenweig* v. *People,* 63 Barb. 634.

The court erred in admitting in evidence the dying declaration of Marie Hecht. Dying declarations are only admissible in evidence where the death of the deceased is the

subject of the charge and the circumstances of the death are the subject of the declaration. Wharton on Homicide, (3d ed.) 972; *North* v. *People,* 139 Ill. 81; Roscoe on Crim. Ev. 28; *State* v. *Howard,* 32 Vt. 380.

The court erred in permitting physicians called by the People to give their opinions as to the cause of the punctures in the uterus. It is error to ask an expert for his opinion as to a controverted question which is to be decided by the jury. *Railroad Co.* v. *Smith,* 208 Ill. 608; *Chicago* v. *Didier,* 227 id. 571; *Traction Co.* v. *Roberts,* 229 id. 481; *People* v. *Hare,* 57 Mich. 505.

The court erred in refusing to instruct the jury as to a form of verdict for manslaughter. *Earll* v. *People,* 73 Ill. 329.

An instruction which directs a verdict must contain all the facts essential to the verdict directed, and if defective cannot be cured by other instructions. *Mai* v. *People,* 224 Ill. 414; *Coal Co.* v. *Barringer,* 218 id. 328; *Pardridge* v. *Cutler,* 168 id. 504; *Railroad Co.* v. *Smith,* 208 id. 608; *Steel Co.* v. *Swiercz,* 231 id. 456; 196 id. 526.

W. H. STEAD, Attorney General, and JOHN J. HEALY, State's Attorney, (JAMES J. BARBOUR, of counsel,) for the People:

Opinions of experts as to matters that involve professional skill and knowledge were properly admitted in evidence. *Clark* v. *People,* 224 Ill. 554; *Chicago* v. *Bork,* 227 id. 60; *Chicago* v. *McNally,* id. 14; *Chicago* v. *Didier,* id. 571; *Chatsworth* v. *Rowe,* 166 id. 114; *Traction Co.* v. *Roberts,* 229 id. 481.

Proof that the prisoner was continuously engaged in criminal practices and had performed criminal operations was admissible to show the criminal intent in the case at bar. *Clark* v. *People,* 224 Ill. 554; *Hagenow* v. *People,* 188 id. 552; *Ackerson* v. *People,* 124 id. 571; *Juretich* v. *People,* 223 id. 484; *Lipsey* v. *People,* 227 id. 364; *People*

v. *Sessions,* 58 Mich. 594; *People* v. *Abbott,* 116 id. 270; *People* v. *Seaman,* 107 id. 348.

The court properly refused to give forms of verdict for manslaughter and assault, as the offense charged was murder, and nothing less. *Clark* v. *People,* 224 Ill. 554; *Kyle* v. *People,* 215 id. 250; *Dacey* v. *People,* 116 id. 555.

Mr. JUSTICE HAND delivered the opinion of the court:

The grand jury of Cook county, on the 22d day of November, 1907, returned into the criminal court of Cook county an indictment against the plaintiff in error charging her with having caused the miscarriage of, or produced an abortion upon, Annie Horvatich, a woman pregnant with child, on the fourth day of May, 1907, and thereby causing her death. The plaintiff in error was arrested, and, having pleaded not guilty, was put upon trial before a jury and was convicted and sentenced to the penitentiary for the period of twenty years, and she has sued out this writ of error to review said judgment.

The indictment contained four counts. The first count, omitting the formal part, charged "that one Lucy Hagenow, otherwise called Louise Hagenow, otherwise called Ida VonSchultz, late of the county of Cook, on the fourth day of May, in the year of our Lord one thousand nine hundred and seven, in said county of Cook, in the State of Illinois aforesaid, in and upon the body of one Annie Horvatich, in the peace of the People of the said State of Illinois then and there being, unlawfully, feloniously, willfully and of her malice aforethought did make an assault, and that the said Lucy Hagenow a certain instrument, a more particular description of which is to the jurors unknown, which she, the said Lucy Hagenow, in the hand of her, the said Lucy Hagenow, then and there had and held, then and there unlawfully, feloniously, willfully and of her malice aforethought did force, thrust and insert into the private parts and womb of her, the said Annie Horvatich, she, the

said Annie Horvatich, then and there being a woman then and there pregnant with child, with intent then and there to produce the miscarriage of her, the said Annie Horvatich, and that she, the said Lucy Hagenow, then and there by the said forcing, thrusting and inserting the said instrument, as aforesaid, into the private parts and womb of the said Annie Horvatich, unlawfully, feloniously, willfully and of her malice aforethought, caused the miscarriage of her, the said Annie Horvatich, it not being then and there necessary to so then and there cause such miscarriage for the preservation of the life of her, the said Annie Horvatich, as she, the said Lucy Hagenow, then well knew, she, the said Lucy Hagenow, then and there well knowing that the use of said instrument as aforesaid, at the time aforesaid, in the manner aforesaid, would then and there produce such miscarriage; that by reason of said miscarriage in the manner and at the time aforesaid, the said Annie Horvatich, from the said fourth day of May, in the year of our Lord one thousand nine hundred and seven, until afterwards, to-wit, the sixth day of May, in the year of our Lord one thousand nine hundred and seven, in the county of Cook and State of Illinois aforesaid, did languish, and languishing did live, on which said sixth day of May, in the year of our Lord one thousand nine hundred and seven, in the county of Cook and State of Illinois aforesaid, she, the said Annie Horvatich, by reason of said miscarriage, died; and so the jurors aforesaid, upon their oaths aforesaid, do say that she, the said Lucy Hagenow, her, the said Annie Horvatich, in manner and form aforesaid, unlawfully, feloniously, willfully and of her malice aforethought did kill and murder, contrary to the statute and against the peace and dignity of the same People of the State of Illinois."

The second count is the same as the first count, except the word "abortion" is substituted in the second count at the several places therein where the word "miscarriage" occurs in the first count.

The third count, omitting the formal part, charged "that one Lucy Hagenow, otherwise called Louise Hagenow, otherwise called Ida VonSchultz, late of the county of Cook, on the fourth day of May, in the year of our Lord one thousand nine hundred and seven, in said county of Cook, in the State of Illinois aforesaid, in and upon the body of one Annie Horvatich, in the peace of the People of the State of Illinois then and there being, unlawfully, feloniously, willfully and of her malice aforethought did make an assault, and that she, the said Lucy Hagenow, in some way and manner and by some means and devices, a more particular description of which is to the jurors unknown, then and there unlawfully, feloniously, willfully and of her malice aforethought did cause the abortion of her, the said Annie Horvatich, a woman pregnant with child then and there being; that it was not then and there necessary to so then and there cause such abortion for the preservation of the life of the said Annie Horvatich, as she, the said Lucy Hagenow, then and there well knew; that she, the said Lucy Hagenow, then and there well knew that the use of those means and devices at the time aforesaid, in the manner aforesaid, would then and there produce such abortion; that by reason of such abortion so as aforesaid produced by the said Lucy Hagenow in the manner and at the time aforesaid, the said Annie Horvatich, from the said fourth day of May, in the year of our Lord one thousand nine hundred and seven, until afterwards, to-wit, the sixth day of May, in the year of our Lord one thousand nine hundred and seven, in the county of Cook and State of Illinois aforesaid, did languish, and languishing did live, on which said sixth day of May, in the year of our Lord one thousand nine hundred and seven, in the county of Cook and State of Illinois aforesaid, she, the said Annie Horvatich, by reason of said abortion, died; and so the jurors aforesaid, upon their oaths aforesaid, do say that she, the said Lucy Hagenow, her, the said Annie Horvatich, in

manner and form aforesaid, unlawfully, feloniously, willfully and of her malice aforethought did kill and murder, contrary to the statute and against the peace and dignity of the same People of the State of Illinois."

The fourth count is the same as the third, except the word "miscarriage" is substituted in the fourth count at the several places therein where the word "abortion" occurs in the third count.

The evidence shows that on Thursday, the second day of May, 1907, Annie Horvatich, with her husband, Michael Horvatich, and three children of a former marriage, the oldest of whom was nine years, lived at 4816 Justine street, in the city of Chicago; that the said Annie Horvatich and Michael Horvatich were married on the 27th day of January, 1907; that on the second day of May said Annie Horvatich was in her usual health; that on that day she did the family washing and in the afternoon went by street car to a savings bank in South Chicago, some three miles distant from her home, and drew from her savings $25 in cash; that at about 6:30 o'clock of the same evening Michael Horvatich, who testified through an interpreter, stated his wife said to him "to go with her and not to be afraid;" that he and his wife went by street car to 480 North Clark street, the home of the plaintiff in error, where they arrived late in the evening; that the plaintiff in error lived in the second flat above the street; that he did not know plaintiff in error and his wife did not tell him her reasons for going to the home of plaintiff in error; that his wife took no clothing other than she had on her person; that he left his wife in the hall of the building in which plaintiff in error lived; that his wife said to him "to go home; I will stay here;" that she told him "to take care of the children and to come and see her on Saturday;" that he left his wife at the plaintiff in error's house and went home; that on Friday afternoon he received the following letter from his wife:

"*Beloved Mike*—I let you know everything is well. Slept very well. Take care of the children. Tell Fanny not to go outside unless she puts a cap and coat on her. If she won't, don't leave her out. You see how she is. You didn't have any coffee at home and you were mad this morning. I will take care you won't be angry. Don't be afraid. There won't be any serious happenings. Will be in the house that day until I go home. Come over Saturday afternoon as you said, and tell the children where you are going, so that they won't go away from the house. Tell them I will come back with you. Nothing else. With love and regards to the children.                              A. H. 480 North Clark street, care Dr. Hagenow, city."

—that on Saturday afternoon he went to the house of the plaintiff in error; that he found his wife sitting on the bed in a room in the house of the plaintiff in error; that she had on an undershirt and her hips were covered by bedclothes; that she said she was not feeling well and that she would remain until Monday; that he returned to his home; that on Sunday afternoon he was summoned by telephone to go to the house of the plaintiff in error; that he arrived at her house at ten o'clock that night; that he found his wife in a different room; that she was in bed; that a doctor by the name of Rasmussen was present; that his wife was very sick; that his wife wanted a doctor from South Chicago to be called, but that the plaintiff in error said it was too late at night to call the doctor; that he remained until toward morning; that his wife was worse; that he went to the house of Mary Galavitch, who could speak English, and she went with him to the plaintiff in error's house; that when they arrived the plaintiff in error told them Annie Horvatich was dead; that she had died at five o'clock that morning; that the plaintiff in error gave them a card and directed them to an undertaker in the neighborhood to take charge of the body; that Michael Horvatich stated that he would prefer an undertaker whom he knew; that the plaintiff in error then sent them to the office of Dr. Rasmussen for a death certificate; that they called upon Rasmussen, and he gave them a certificate that Annie Horvatich died of pneumonia and bronchitis.

W. J. Freckleton, an undertaker, testified that he was sent by Michael Horvatich to 480 North Clark street for the remains of his wife; that he arrived about five o'clock in the afternoon of the sixth of May; that the plaintiff in error said she was running a private hospital; that he should wait until it was dark and take the body from the house through the alley; that he returned at nine o'clock the same evening with an assistant; that he had difficulty in getting the body out of the building, as the hall and steps were narrow; that the plaintiff in error said there was ample room; that her undertaker never had any trouble in getting bodies out the back way; that he took the remains to the south side and the body was interred.

It also appears that on the 13th of May the coroner of Cook county caused the remains of Annie Horvatich to be disinterred in the presence of her brother, John Sneller, and others who were present; that Dr. E. R. LeCount, a teacher in Rush Medical College, Dr. Warren J. Hunter, coroner's physician, and Dr. Rudolph W. Holmes, a graduate of Rush Medical College and a specialist in obstetrics and gynæcology, made a *post mortem* examination. They found the vital organs of the body, such as the lungs, the heart, the spleen and the stomach of Annie Horvatich to be in a healthy and normal condition; they also found that Annie Horvatich had been pregnant but found no foetus. They found the uterus torn and lacerated, and gave it as their opinon that Annie Horvatich died from the effect of peritonitis, caused by the rupture and laceration of the uterus. They also agreed that it was not necessary to cause Annie Horvatich to abort or miscarry in order to save her life, and they each expressed the opinion she had been pregnant about three months at the time the injuries which they discovered were inflicted upon her; that such injuries were caused during life and that she lived a few days after they were inflicted.

Plaintiff in error testified that Annie Horvatich came to her place on Thursday evening, May 2, and that she died Monday morning, May 6. She said she made an examination of her private parts upon the evening that she came and found her flowing; that Annie Horvatich told her that she had not "come around," and that she had been to see a doctor on the south side and that he had brought her around. She testified she found no rupture of the uterus or other derangement of the private parts, other than an offensive flow therefrom; that she diagnosed the case as pneumonia, and insisted Annie Horvatich died of pneumonia and bronchitis. She states Annie Horvatich paid her $15; that she called Dr. Rasmussen, who she admitted she knew had been charged by the public officials as an abortionist.

The State introduced in evidence several advertisements which the plaintiff admitted that she had caused to be published in the Chicago daily newspapers, samples of which are as follows: From the files of the *Chicago Daily News* of July 24 and July 22, 1899, reading as follows: "Dr. Louise Hagenow; licensed physician; expert; twenty-seven years; female diseases; a new scientific, painless method; no operation; good results; 330 East Division street, near Wells; 10 to 4, 7 to 8." Also from the *Record-Herald* of March 13, 1905, as follows: "Ida Von-Schultz, 480 North Clark street; regular graduate; expert in obstetrics, female complaints, etc., and all difficult cases; twenty-five years' experience; ladies call or write; near Division; telephone, Dearborn 2." And in the same column, from the *Record-Herald* of March 13, 1905, and right under that advertisement: "Dr. Lucy Hagenow, licensed physician; specialist in tumors, irregularities, etc.; new scientific, painless method; no operation; success guaranteed; twenty-eight years' experience; private sanitarium, 310 W. Madison." Also from the *Record-Herald*

of March 5, 1905, and from the *Chicago Examiner* of March 13, 1905, as follows: "Dr. Lucy Hagenow, licensed physician; specialist; all women's troubles; new scientific, painless method; no operation; success guaranteed; twenty-eight years' experience; confinement home, 310 West Madison street."

The State, over the objection of the plaintiff in error, called police officer Frank Snyder, who testified, in substance, that on August 31, 1899, the defendant, who was then known as Louise Hagenow, was brought into a room at St. Elizabeth's Hospital by two detectives. Marie Hecht was lying in bed in the room at the time. The witness wrote out a statement that Marie Hecht there dictated. Marie Hecht signed it, and after it had been read aloud Mrs. Hagenow went to the bedside of the girl and said, in German, "Is it as bad as this, my poor child?" The victim answered, "Yes, see what you have done!" Mrs. Hagenow said, "Why, you had a flow when you came to me, did you not?" Marie said, "I didn't have no flow." Mrs. Hagenow said, "Yes, you did; tell these people now you did have a flow." Marie said, "No, I didn't have a flow and I won't tell the people that I had a flow." This conversation took place in German and the witness understood German. The witness stated that on seeing the document his recollection was refreshed as to what the conversation was and as to what he wrote down, and that the words in the document were uttered there in the presence of the defendant, Hagenow, as he had stated. He could not repeat the identical words without having the document before him. The court then allowed the statement to be read. Witness further testified that Marie Hecht is not now living; that he saw her dead in the morgue two days following the making of the statement; that right when the statement was signed Marie Hecht said, "That is the woman who performed the abortion." After the document was signed and the conversation related as having taken place in German,

Louise Hagenow did not say anything more in the presence of Marie Hecht. This statement shows that for the sum of $70 Dr. Hagenow performed an illegal operation for Marie Hecht.

In connection with the testimony of officer Snyder the court admitted in evidence the statement of Marie Hecht, the plaintiff in error, which, omitting the formal parts, is as follows:

"I am twenty-three years old, and will be twenty-four years on the tenth day of November. I was born in Villason county, Luzerne, Switzerland, where my parents still reside. I left Germany four years ago. In January of this year I became acquainted with John Schockweiler, a young man about twenty years old, who is employed in a freight house on the south side and resides at 140 Orleans street. I had sexual intercourse with him for about five or six times and in the month of May I noticed I was pregnant, and on Thursday, at 12:30 P. M., August 24th, 1899, I went of my own free will to visit Dr. Louise Hagenow, at 330 Division street. She laid me on a lounge and examined me, and after the examination she said she would relieve me of the child for $75, and that she would take it from me with instruments. 'No,' I said, 'No; I cannot afford to pay you $75 for the work; I'll give you $70.' Then she agreed. I then gave her $70. She first laid me on a lounge and began to use an instrument on me. During that time I suffered considerable pain. I remained on the lounge for about twenty minutes. Then the doctor made me get up and walk about the room. I was so weak I could not walk very long. Then I went and laid down on the bed. The doctor then came in and began to use instruments again. I felt as though I was being cut to pieces, and at about 5:30 P. M. she took the child away from me. I suffered great pain, and the following day, Friday, August 25th, I left and took a car for 941 North Clark street,—a friend of mine named Spitzer,—where I remained until Monday morning at ten o'clock, August 28th, when I left and was brought to the St. Elizabeth Hospital in a carriage.

"If I die I desire that all costs and expenses attending my funeral expenses shall be paid out of my savings, which amount to $300, and which is in the Germania Safe Deposit Vaults, corner of Clark and Germania place. Mr. Gomme, my employer, still owes me $76 for services rendered after all the aforesaid expenses are paid. I desire that the balance of my money be paid to my parents, John and Anne Hecht, of Villason county, Luzerne, Switzerland. I now see the woman standing at my bedside who performed the abortion."

The State, over the objection of the plaintiff in error, called Dr. A. M. Corwin, who testified, in substance, that between ten and fifteen years ago he was called to the office of Dr. Hagenow, at the corner of West Madison and Hoyne streets, about eight o'clock in the evening. The defendant said to him at that time, "I am in trouble." The substance of what she said was that she was in trouble and needed aid. At that time her arms were bare to the elbows. Her arms and hands were bloody. She motioned Dr. Corwin to an adjoining room. There he found another woman, whose name he does not remember. There was a strong smell of ether in both rooms. He also saw a woman, apparently well nourished and healthy-looking, in bed. A sheet was covered over her. The ether was much stronger in that room than in the outer room. He took the sheet down and saw a mass of intestines upon the bare thighs. Upon further examination, after calling another doctor on the telephone, they found that the intestines were protruding from the vagina through a large rent from the abdominal peritoneal cavity. The uterus to the sense of touch seemed normal. They at once replaced the intestines, which were protruding from the vaginal tract, and told Dr. Hagenow she ought to get the case to the hospital, because death would follow shortly. She agreed to do that.

Also sergeant of police George W. Pearsall, who testified, in substance, that he knew plaintiff in error under the name of Ida VonSchultz in February, 1906. He saw her then at 480 North Clark street, second floor. There were signs in the front of the building, "Dr. Lucy Hagenow, Physician and Midwife," and "Dr. Ida VonSchultz, Physician and Midwife." Witness met defendant at the door and asked if she was Dr. Hagenow. She said she was not. When asked who she was, she answered, "I am Dr. Ida VonSchultz." The witness took Dr. Hagenow to the Passavant Hospital about five o'clock on the afternoon of February 20, 1906, and brought her into the presence of

Miss Lola M. Maddison, of Salt Lake City, who was a patient there and a very sick woman. Lola Maddison was in bed. Captain Healy and the witness and the defendant were there. He asked Lola, "Do you know this woman?". She said, "Oh, yes; that is the doctor." The captain asked, "Is that the doctor who performed the abortion on you?" She said, "Yes." She was asked, "Where did she perform the abortion?" and answered, "In her office, on Clark street." Witness asked her if it was 480 North Clark street. She said "Yes." Dr. Hagenow stepped up to the side of the bed, rubbed the girl's face with her hand, and said, "Don't talk too much, my girl; it won't do you any good." She then stooped over and whispered something to the girl, but the witness did not hear what it was.

Also Mrs. Eva Herndon, a private investigator for the United States postal authorities, who testified, in substance, that she had a talk with Mrs. Hagenow at her home on January 22, 1907. "I asked her her charges for a married woman who was pregnant two months, and she said $50, and she would take care of her during the time she was there, which would be something like eight days, and that she did her work by applications. That is about all the conversation." The witness further said that on January 15 she had seen the defendant, who at that time responded to the name of Ida VonSchultz, and at that time the witness asked her what her charges would be to take care of a young lady and board her who was two months pregnant. She said it would be $35 if she only gave her the treatments and did not board her; that a great many women imagined they were in that condition when they only had other female troubles; that she had a woman that morning who was in the same condition and was not pregnant. That is about the amount of the conversation at that time.

On cross-examination the plaintiff in error admitted she was involved in the death of Hannah Carlson, who died from abortion.

The first contention made by the plaintiff in error is that the court erred in admitting evidence of plaintiff in error's connection with crimes not connected with the offense charged in the indictment. The law is well settled in this as it is in all jurisdictions where the common law is in force, that as a general rule evidence of a distinct, substantive offense cannot be admitted in support of another offense. (*Farris* v. *People,* 129 Ill. 521; *Addison* v. *People,* 193 id. 405.) This rule, however, has certain well settled exceptions, and where it is necessary to show guilty knowledge or a particular intent in order to establish the offense charged in the indictment, proof of other acts of a defendant of the same character as those charged in the indictment may be submitted to the jury, as, for instance, where a defendant is charged with having in his possession or with uttering counterfeit bills or coin, (*People* v. *Seaman,* 107 Mich. 348,) or with receiving stolen property. (*Lipsey* v. *People,* 227 Ill. 364.) Proof that the defendant had in his possession, or passed, other counterfeit bills or coin or had received into his possession other stolen property may be shown for the purpose of establishing guilty knowledge and intent on the part of the defendant, as it is the observation of all that an innocent man might readily have in his possession or pass a counterfeit bill or coin or receive into his possession stolen property. If, however, it was known a defendant repeatedly carried and passed spurious bills and coin or repeatedly received into his possession stolen property it would not be reasonable to presume he did so without knowledge that the money was counterfeit or the goods stolen. The question, therefore, in this case is narrowed to this: Does the case at bar fall within the general rule or does it come within the exception to that rule?

In some jurisdictions proof that the defendant had been guilty of causing criminal miscarriages or abortions upon other pregnant women than the one named in the indict-

ment has been held proper upon a trial against the defendant upon an indictment of this character, (*People* v. *Sessions*, 58 Mich. 594; *People* v. *Seaman, supra*;) while in other jurisdictions it has been held that such proof is not competent; (*Rosenweig* v. *People*, 63 Barb. 634; *State* v. *Crofford*, 121 Iowa, 395;) and while there is some conflict in the authorities and the question is not free from doubt, we think that the evidence is admissible.

The statute under which the indictment is framed reads as follows: "Whoever, by means of any instrument, medicine, drug or other means whatever, causes any woman, pregnant with child, to abort or miscarry, or attempts to procure or produce an abortion or miscarriage, unless the same were done as necessary for the preservation of the mother's life, shall be imprisoned in the penitentiary not less than one year nor more than ten years; or if the death of the mother results therefrom; the person procuring or causing the abortion or miscarriage shall be guilty of murder." (Crim. Code, sec. 3, p. 665.)

In *Beasley* v. *People*, 89 Ill. 571, it was held that it was necessary in an indictment under said statute to negative the fact that the miscarriage or abortion was necessary to save the mother's life. And in *Slattery* v. *People*, 76 Ill. 217, it was said that the statute was evidently aimed at the professional abortionist. If it is necessary to negative the fact that the miscarriage or abortion was caused or performed for the purpose of saving the mother's life, it is necessary by competent proof to establish that fact. The plaintiff in error claimed to be a regularly licensed physician, and the jury were justified in finding, from the testimony, that Annie Horvatich was pregnant when she went to the plaintiff in error's house, and that while there she miscarried or aborted by reason of her uterus being ruptured, which caused peritonitis, from the effect of which she died. Had the evidence shown that Annie Horvatich was the only pregnant woman whom the plaintiff in error

236—34

had caused to miscarry or abort, it might not have been unreasonable to presume that she did so in good faith and for the purpose of saving the woman's life. If, however, it could be shown that the plaintiff in error advertised in the public press to treat women who were pregnant; that she stated in such advertisement that she had had long experience in the treatment of women who were pregnant; that she was an expert in obstetrics; that she had knowledge of a "new scientific, painless method;" that "no operation was necessary," etc.; and it further appeared from the evidence that for twenty-seven years the plaintiff in error had been constantly engaged in producing miscarriages and causing abortions upon pregnant women; that she kept a place for the treatment and care of women upon whom miscarriages and abortions had been caused and performed; that she was surrounded at her house by men and women engaged in the business of causing and producing criminal miscarriages and abortions, and that she had caused the death of several women upon whom she had caused miscarriages and produced abortions within a few years prior to her indictment for causing the death of Annie Horvatich,—it would be clear, we think, that the presumption that she caused Annie Horvatich to miscarry or abort to save her life would be greatly weakened and a criminal knowledge and intent on her part to cause Annie Horvatich to miscarry or abort would be shown. While the plaintiff in error denied that she caused Annie Horvatich to miscarry or abort, it is evident that she was responsible for the miscarriage or abortion which followed the arrival of Annie Horvatich at her place. It was therefore necessary that the proof show and the jury find, in order to convict the plaintiff in error, that the miscarriage or abortion which was caused or produced upon Annie Horvatich was not caused by plaintiff in error to save the woman's life; and while the jury would have been justified in finding, from the condition of the woman when she went to

the plaintiff in error's place and the testimony of the physicians who made the *post mortem* examination, that no cause existed for the causing of a miscarriage or the producing of an abortion upon Annie Horvatich to save her life, the State was not required to rely upon this class of testimony alone, but had the right to show, if it could, that the plaintiff in error was not carrying on a hospital in a legitimate way for the treatment of women who were pregnant, but that she was a professional abortionist, for the purpose of rebutting the presumption that she in good faith caused the miscarriage or produced an abortion upon Annie Horvatich to save her life, and for the purpose of showing that she must have known Annie Horvatich was pregnant, and that she operated upon her with the criminal knowledge and intent to cause her to miscarry or to abort; and if such testimony was competent as a part of the State's case in chief, plaintiff in error could not render it incompetent by any defense to the indictment which she might seek to interpose. We think the view above expressed is fully sustained by this court in *Scott* v. *People,* 141 Ill. 195, *Hagenow* v. *People,* 188 id. 545, and *Clark* v. *People,* 224 id. 554, and by numerous text writers and adjudicated cases. 1 Ency. of Evidence, p. 54; Underhill on Crim. Evidence, sec. 345; *Regina* v. *Dale,* 16 Cox's Crim. L. C. 703; *People* v. *Sessions, supra; People* v. *Seaman, supra.*

In the *Scott case* the evidence tended to show that the defendant operated upon the prosecutrix with instruments three times,—once about October 15, and again just before November 15, and again subsequent to November 15,— and the defendant contended that the court admitted, in permitting proof of the three operations, evidence of three distinct offenses. The court, on page 213, said.: "We think the testimony was competent. Acts of the defendant tending to show his knowledge of a woman's pregnancy and his intention to commit an abortion upon her may be proved, whether they were prior or subsequent to the par-

ticular act charged in the indictment." In the *Hagenow case,* on page 552, will be found the following advertisement: "Dr. Louise Hagenow, licensed physician; female irregularities; new scientific, painless method; good treatment; good results; expert, twenty-seven years; private home; 330 E. Division, near Wells," which the defendant admitted she caused to be published in one of the daily papers in Chicago. This advertisement was set out in that part of the opinion which considers the question whether the evidence was sufficient to sustain the verdict, and the court apparently gave great force to its weight on the proposition that it showed guilty knowledge and guilty intent on the part of the defendant, and tended to establish that she did not commit the abortion upon Marie Hecht with a view to save her life. And in the *Clark case* proof was introduced by a number of witnesses that at different times preceding the commission of the offense charged in the indictment, the defendant, Ida Clark, had solicited the patronage of pregnant women and held herself out as being able and willing to commit abortions or commit miscarriages upon them by means of instruments and medicines. The court, on page 563, said: "On a trial for an offense such as charged in this indictment, intent is an essential ingredient, and it is competent to show the declarations of one on trial for procuring an abortion, to the effect that she was in the habit of performing or had solicited such work."

The contention is made that the *Clark case* differs upon its facts from the case at bar, and that what was said in that case should not be applied in this case. The evidence in that case was held admissible on the ground that it showed a willingness and ability upon the part of the defendant to perform the acts charged against her in the indictment, and that such evidence established, or tended to establish, guilty knowledge or intent upon the part of the defendant,—and such was the object of the testimony to which objection is made in this case. Furthermore, the

*Clark case* cites with approval the case of *People* v. *Sessions*, 58 Mich. 594, which fully shows the view the court had in mind upon the question under discussion.

In the *Sessions case* the testimony of four of the People's witnesses relating to the defendant's possession of instruments to produce an abortion and her use of them and her knowledge upon the subject, and that she had held herself out for the performance of such service, with the instruments, for hire, was given on the part of the prosecution. It consisted of conversations the defendant had with these four persons, extending through a period of four years previous to the death of Mrs. Peck, the woman whose death she caused, wherein the defendant stated to one that she had the instruments with which to produce abortions, had herself got rid of a number of children, and showed her the instruments, at the same time saying to the witness if she wanted any help she could help her. To another she stated that she had committed abortions and could do it again; that she had the instruments to use in doing it. To another she stated her terms for performing such service, which she then proffered to the witness, who was in the family way, and told her she had the instruments for the purpose. This testimony was all objected to by counsel for the defendant. The court, in holding the testimony admissible, on page 601 of the opinion, said: "It is true, as claimed by him, that the general rule, as stated by Mr. Justice Christiancy in *People* v. *Jenness,* 5 Mich. 320, is well settled in this State. It is: 'That [in criminal cases] the commission of other, though similar, offenses by the defendant cannot be proved for the purpose of showing that he was more likely to have committed the offense for which he is on trial nor as corroborating the testimony relating to the commission of such principal offense.' (*People* v. *Schweitzer,* 23 Mich. 301; *Lightfoot* v. *People,* 16 id. 507.) And to the same effect are several cases in the State of New York. (*Coleman* v. *People,* 55 N. Y. 81;

*People* v. *Corbin,* 56 id. 363; *Copperman* v. *People,* id. 591.) But we do not think the rule is infringed in this case. The testimony was offered only to show knowledge and intent and the possession of the necessary means to accomplish the act in her own chosen way, and for the purposes offered the testimony was competent. The tendency of the testimony was to prove facts within the issue. (*People* v. *Doyle,* 21 Mich. 227; *People* v. *Marble,* 38 id. 123; *Commonwealth* v. *Briggs,* 5 Pick. 429; *Osborne* v. *People,* 2 Park. Cr. Rep. 583; *Mason* v. *State,* 42 Ala. 537; *State* v. *Harrold,* 38 Mo. 496; *Brown* v. *Commonwealth,* 76 Pa. St. 319; *Weed* v. *People,* 56 N. Y. 628; *People* v. *Henssler,* 48 Mich. 49; *United States Life Ins. Co.* v. *Wright,* 33 Ohio St. 533; *Coleman* v. *People,* 55 N. Y. 81; *Commonwealth* v. *Shepard,* 1 Allen, 575; *Commonwealth* v. *Price,* 10 Gray, 472; *People* v. *Clark,* 33 Mich. 112; *People* v. *Brewer,* 27 id. 134; *Boyce* v. *People,* 55 N. Y. 644.) The testimony cannot be considered too remote when it appears that the respondent is shown, by her own statements, to have had the very instruments in her possession which it was claimed she used in producing the death of Mrs. Peck, during the entire period covered by the testimony, and was offering her services to aid those who desired to commit the offense of abortion. The testimony was clearly warranted by the facts and circumstances appearing in the record, and no error was committed in receiving it.—*People* v. *Niles,* 44 Mich. 607."

In *People* v. *Seaman, supra,* the defendant was charged, jointly with one Alice Lane, with having committed an abortion upon one Emily Hall, at the house of Alice Lane. Upon the trial a witness testified, on behalf of the State, that she gave birth to a child in the Lane house on Tuesday evening, January 29, 1895. Another witness testified that respondent operated upon her with instruments at the Lane house on January 23, 1895, and that she was four months gone at the time. Another witness testified that

respondent operated upon her at the Lane house in June, 1894, and took from her a three and one-half month fœtus, and that she operated on her again in October, 1894, at the same place, and took away a fœtus six weeks old. The court, in a very elaborate opinion by Judge McGrath, held this evidence competent. In the *Seaman case* the defendant denied that he used any means upon Emily Hall to cause her to miscarry or abort, as the plaintiff in error denies in this case that she used any means upon Annie Horvatich to cause her to miscarry or abort, but claimed Emily Hall aborted or miscarried as the result of an ocean voyage, while the plaintiff in error claims Annie Horvatich aborted or miscarried in consequence of the criminal act of some doctor on the south side before she came to her house. The only difference in the facts of the two cases is, that the defendant in the *Seaman case* admitted Emily Hall gave birth to a child while he was treating her, while the plaintiff in error claims Annie Horvatich miscarried or aborted before she came to her place. Counsel for plaintiff in error seek to draw a distinction between these cases. We are of the opinion, however, the cases cannot be differentiated. In the *Dale case* the defendants were charged with attempting to cause the miscarriage of one Annie Elizabeth Smith by the use of a quill. It was said by counsel that the quill might have been used to open an abscess and the subsequent miscarriage been an accidental result, and it was held, to rebut any presumption that the miscarriage was accidental as a result of the use of the quill, it was admissible to prove that the defendants had caused, with a similar instrument, miscarriages upon other occasions upon other women.

The court, at the instance of the People, instructed the jury that the evidence hereinbefore referred to was proper to be considered by them solely for the purpose of determining the question whether the plaintiff in error had intent and guilty knowledge, and whether she had the means and opportunity to perform the operation and inflict the

wounds in the private parts and body of Annie Horvatich, as alleged and claimed in this case. If the testimony was admissible for the purpose of showing guilty knowledge and intent on the part of the plaintiff in error and that she had the means and the opportunity to commit the offense, it was competent, regardless of the fact that it, when properly admitted, might have the effect to prejudice the jury against the plaintiff in error. If evidence is admissible under any issue in a case or for any purpose it should not be excluded. (*Ruggles* v. *Gatton,* 50 Ill. 412.) It is, however, a proper practice, as was done here, to limit such evidence, by an instruction, to its proper office in the case.

In *Baker* v. *People,* 105 Ill. 452, the plaintiff in error and one Eliza Graves were jointly indicted and convicted of attempting to procure and produce the miscarriage of Martha VanAntwerp. Baker alone sued out a writ of error. The evidence showed Baker was responsible for the unfortunate condition of Martha VanAntwerp; that he first gave her medicine with a view to cause her miscarriage; that he afterwards inserted into her private parts a wire with the purpose to cause her to miscarry, and that he afterwards took her to the home of Mrs. Graves, who operated upon her with instruments with a view to cause her miscarriage. The court held that three distinct offenses had been committed, and that the State, upon the trial, should have been required to elect for which offense it would prosecute, and it was incidentally said it would be error to admit evidence of the offenses other than the one upon which the prosecution was being carried on. In the case of *Scott* v. *People, supra,* the doctrine announced in the *Baker case* was repudiated, and it was held, as we have seen, that evidence of the several attempts made in that case, three in number, was admissible. To the same effect are *Commonwealth* v. *Corbin,* 136 Mass. 429; *Lamb* v. *State,* 66 Md. 285; *King* v. *State,* 34 S. W. Rep. 282; *Sullivan* v. *State,* 121 Ga. 183; see, also, Hughes on Crim. Law

and Proc. sec. 1934.  The *Baker case* is therefore no longer the law of this State.

After a most careful consideration of the question raised by the plaintiff in error as to the admissibility of this class of evidence in this case, we are constrained to hold that the court did not err in admitting the evidence of the plaintiff in error's connection with other offenses similar to the one with which she was charged and upon trial under this indictment, and while the case of the plaintiff in error may have been prejudiced by the admission of such evidence, such fact, if true, is not the fault of the law, but the misfortune of the plaintiff in error in finding herself surrounded by the facts and circumstances, upon her trial, offered in proof, for which facts and circumstances she alone, and not the State, was responsible.

It is also urged that the court erred in admitting in evidence the dying declaration of Marie Hecht, and authorities are cited to the effect that a dying declaration is only admissible in evidence where the death of the deceased is the subject of the charge and the circumstances of the death are the subject of the declaration.  The declaration signed by Marie Hecht was prepared, signed and read aloud in the presence of the plaintiff in error, and she made no denial of the truth of the facts contained in the statement, and the statement was admitted in evidence, not as the dying declaration of Marie Hecht, but as the admission of the plaintiff in error for the purpose of showing the plaintiff in error's connection with the operation which caused the death of Marie Hecht.  We do not think the court erred in admitting in evidence said statement.

It is also contended that the court erred in permitting the physicians who made the *post mortem* examination to give their opinion as to the cause of the punctures and lacerations found in the uterus of Annie Horvatich.  The physicians discovered, upon the *post mortem* examination, that the uterus was punctured and lacerated, the top of the

uterus being torn or punched off, and they, in effect, stated that they were of the opinion that said puncture, tear and laceration were caused by some hard substance being forced through the uterus, which had been inserted through the mouth of the womb of Annie Horvatich during life, which caused peritonitis, from the effect of which Annie Horvatich died. The question what caused the death of Annie Horvatich was clearly a question for opinion evidence by medical men, and we think it was proper for the physicians who examined the uterus to state to the jury the conditions which they found, and it appearing that it was ruptured, torn and lacerated, how, in their opinion, such ruptures, tears and lacerations were made. In *Village of Chatsworth* v. *Rowe,* 166 Ill. 114, it was said on page 117, the physicians who examined the plaintiff's knee having testified that it could have been produced by a fall or an external injury: "If, from an examination, the physician was able to tell what was the cause of the injury, his opinion was competent for the jury, in connection with other evidence." And in *Clark* v. *People, supra,* particular stress is laid upon the testimony of the physician who made the *post mortem* examination, to the effect that in his judgment the injury was produced with a blunt instrument. And in *City of Chicago* v. *Bork,* 227 Ill. 60, it was held proper for a physician to give it as his opinion that the diseased condition disclosed by the evidence was due to a physical injury, and that it was not error to ask what was the proper cause of the disordered physical condition from which the evidence showed appellee was suffering. And in *City of Chicago* v. *Didier,* 227 Ill. 571, on page 575, it was said: "Appellant contends that the inquiry should be as to whether the injury might have produced the physical conditions, and not whether it did produce them. Expressions will be found in some cases tending to support that view, but the weight of authority in this State, as well as in other jurisdictions, does not support appellant's contention." And in *Chicago*

*Union Traction Co.* v. *Roberts,* 229 Ill. 481, it was said
(p. 484) : "In this case the question was whether the ap-
pellee's condition was due to traumatism or other causes.
It was a question for the jury to determine, but it was im-
possible for them to answer without hearing the opinions
of physicians. These opinions did not invade the province
of the jury. * * * It is entirely immaterial whether the
witness testified that the injury was the cause of the con-
dition, or that the injury was sufficient to cause the condi-
tion or might have caused it. In any event, the testimony
was merely the opinion of the witness. * * * It still
remained for the jury to determine the facts, and the opin-
ion was nevertheless an opinion only, whether it states what
did cause the condition or what might cause it."

The case of *Illinois Central Railroad Co.* v. *Smith,* 208
Ill. 608, is not in conflict with the foregoing cases. In that
case the witnesses for the respective parties disagreed as to
what caused the injury,—that is, whether the foot of the
plaintiff was crushed or punctured,—and plaintiff sought
to corroborate his testimony by calling physicians to state
that it was punctured. Here there was no conflict as to
the conditions or that they were caused otherwise than
in the manner pointed out by the physicians. In *City of
Chicago* v. *Didier, supra,* the authorities bearing upon this
question are reviewed, and it was there held that in a case
like this, where there is no conflict as to the condition of
the injured parts, an expert medical witness may express his
opinion as to the manner in which the injury was caused,—
that is, whether the conditions were caused by disease or
by traumatism, such as by a gun-shot wound, a stab with
a sharp instrument, like a dagger, or a blunt, hard instru-
ment, like a sound or a stick. We are of the opinion the
evidence of the physicians upon the question at issue was
properly admitted.

It is further contended that the court erred in giving
to the jury the People's sixteenth and seventeenth instruc-

tions, on the ground that they each omit, in stating the facts which must be shown to entitle the State to a conviction, the element that Annie Horvatich was pregnant. These instructions read as follows:

16. "The court instructs you that if you shall find, from the evidence in the case, beyond a reasonable doubt, that Annie Horvatich died from the result of an operation and that the operation was performed with the intent to produce an abortion on her, and that the operation was performed by the defendant, Lucy Hagenow, otherwise called Louise Hagenow, otherwise called Ida VonSchultz, or by any person acting under the defendant's direction, or if the defendant aided, abetted and encouraged the operation in any manner, and that the operation was not done as necessary to preserve the life of Annie Horvatich, then in such case the court instructs you, that, as a matter of law, the defendant is guilty of murder in manner and form as charged in the indictment.

17. "The court instructs you that if you shall believe, from the evidence in the case, beyond a reasonable doubt, that the defendant, Lucy Hagenow, otherwise called Louise Hagenow, otherwise called Ida VonSchultz, inflicted the injury alleged in the indictment, in the private parts and body of Annie Horvatich, with an intent to cause Annie Horvatich to abort and miscarry and not as necessary to preserve her life, and that such injury resulted in the death of Annie Horvatich, then in such case the court instructs you, as a matter of law, that the defendant is guilty of murder in manner and form as charged in the indictment."

If those instructions stood alone there would be much force in the contention of the plaintiff in error, but when they are considered in connection with the other instructions given to the jury we do not think they worked any harm to the plaintiff in error. The court, by instruction 35, informed the jury "that before the defendant in this case can be convicted each one of the following propositions

must be proven beyond a reasonable doubt: (1) That Annie Horvatich was pregnant; (2) that while Annie Horvatich was pregnant she aborted or miscarried; (3) that said abortion or miscarriage was produced by criminal means; (4) that said criminal means were employed by the defendant, or that she aided, abetted and encouraged the employment of such means; (5) that said Annie Horvatich died as the result of said abortion and miscarriage. If the jury have a reasonable doubt of the truth of any of the foregoing propositions they must find the defendant not guilty." By that instruction the court clearly informed the jury that they could not convict the plaintiff in error unless it had been established, beyond all reasonable doubt, that Annie Horvatich was pregnant. The instructions complained of did not direct the jury, in case they found the facts stated therein to be true, to find the plaintiff in error guilty. They merely stated that those facts, if proven, constituted the crime of murder. While one instruction may omit some needed qualification and appear to be misleading when considered alone, it may not be misleading or improper when considered with the other instructions, and it is sufficient if the instructions, taken as a whole, present the law to the jury with substantial correctness. (*Toluca, Marquette and Northern Railway Co.* v. *Haws,* 194 Ill. 92.) An instruction is to be read in connection with all the other instructions given in the case, and it is well settled that the instructions in a given case must be considered as a series, and if, when so considered, they fully and fairly instruct the jury as to every material fact in controversy they will be considered as sufficient. (*Fessenden* v. *Doane,* 188 Ill. 228.) We think, therefore, the defect therein contained could be cured by other instructions, and that such defect was cured, and that the jury were not misled by the giving to them of the sixteenth and seventeenth instructions, to the prejudice of the plaintiff in error.

It is also urged that the court erred in refusing to give to the jury the form of a verdict for manslaughter. The jury had the power, under the indictment, to find the plaintiff in error guilty of manslaughter, (*Earll* v. *People,* 73 Ill. 329,) and they were so instructed. The evidence, however, clearly showed the plaintiff in error to be guilty of the crime of murder, if of any crime, and the court did not err in refusing to submit to the jury a form of verdict of manslaughter, and thereby invite the jury to find the plaintiff in error to be guilty of manslaughter when the evidence showed her to be guilty of murder if guilty of any crime. (*Crowell* v. *People,* 190 Ill. 508; *Kyle* v. *People,* 215 id. 250.) In the *Crowell case,* on page 515, it was said: "Where one is indicted for an assault with intent to commit murder and the facts establish an assault of a lower grade, the jury may convict him of the lesser offense; but the law does not authorize or intend that a person guilty of an assault with intent to commit murder shall be found guilty of an assault of a lower grade, or that the jury shall be left free to do so regardless of the evidence. * * * The law is, that if a defendant is guilty of an assault with intent to commit murder he ought to be convicted by the jury of that offense. * * * It is not designed that he should be found guilty of a lesser crime than an assault with intent to commit murder, upon proof, beyond a reasonable doubt, of an assault, with malice aforethought, of a character likely to cause death, or where the facts show a reckless or total disregard of human life." There was no error in the action of the trial court in declining to submit to the jury the form of verdict of manslaughter.

It is also insisted that the State's attorney exceeded his privilege in the argument to the jury and in the cross-examination of the plaintiff in error as a witness, in this: that he stated to the jury the plaintiff in error had publicly and notoriously been engaged in the business of murder in the city of Chicago for a number of years and urged

the jury to send her to the penitentiary for her natural
life, and that upon the cross-examination of the plaintiff
in error he asked her if the pictures of the people who are
dead (referring, apparently, to Marie Hecht and others,)
did not at times come to her mind. The State's attorney,
in the argument to the jury, should confine himself to a dis-
cussion of the facts disclosed by the evidence. In *Crocker
v. People,* 213 Ill. 287, on page 290, it was said: "A gross
abuse of the privilege of counsel to argue the facts and
law of the case to a jury, if it prejudices the cause of the
opposite party, would constitute good ground for a new
trial; but arguments and statements of counsel based on
the facts appearing in the proof, or on legitimate inferences
deducible therefrom, do not transcend the bounds of legiti-
mate debate and are not to be discountenanced by the courts.
It is not improper for a prosecuting attorney to reflect un-
favorably on defendant or denounce his wickedness, and
even indulge in invective, if based upon evidence competent
and pertinent to be decided by the jury. (2 Ency. of Pl.
& Pr. 747.) It is not improper for the prosecuting attor-
ney to denounce a defendant to be a murderer, in the trial
of an indictment for murder, if there is testimony tending
to support the truth of the charge. (*State* v. *Griffin,* 87
Mo. 608.) Whatever is deducible from the testimony by
direct proof or legitimate inference from facts that are
proven, and which bears upon the issue in a cause, must be
a fair subject of comment by counsel, and if such deduc-
tions or inferences tend to fix upon a defendant the wicked-
ness and crime that are charged against him, it must be
within the scope of proper and fair argument to denounce
him accordingly." In the case at bar, while the State's at-
torney used strong language in the course of his oral argu-
ment, we cannot say that he was not justified in using the
language he did in commenting upon the criminal conduct
of the plaintiff in error, as disclosed by the evidence found
in this record. Neither can we say that the questions pro-

pounded to the plaintiff in error upon cross-examination were improper, when the entire cross-examination of the plaintiff in error is taken into consideration.

It is finally urged that the verdict is not supported by the evidence. We have fully set forth the facts in this opinion disclosed by this record, and we feel justified in saying, without further discussion, that in our opinion they establish the guilt of defendant beyond all reasonable doubt.

We have given this record the patient examination which the importance of the case to the State and to the plaintiff in error demands, and have found no error therein which would justify this court in reversing the judgment of conviction rendered by the criminal court against the plaintiff in error.

The judgment of the criminal court will be affirmed.

*Judgment affirmed.*

Mr. JUSTICE SCOTT, dissenting:

In jurisdictions other than ours, the question whether, upon a trial for murder where death results from abortion, evidence of a previous unlawful abortion or abortions committed by the defendants upon a woman or women other than the deceased may be admitted for the purpose of showing the unlawful intention of the accused in doing the alleged acts charged by the indictment, is one upon which the adjudicated cases are in conflict. In our own State the proposition has been determined against the contention of the prosecution by the case of *Baker* v. *People,* 105 Ill. 452, which was a prosecution for attempted abortion. The precise point now under consideration was there involved. The court, after stating the general rule that in the trial of a party for one offense growing out of a particular transaction, evidence of a substantive offense resulting from another and entirely separate transaction cannot be received, continued: "An exception to this rule is found in prosecutions for passing counterfeit money, and the like,

where previous attempts to pass counterfeit money may be proved for the purpose of showing guilty knowledge, but the principle involved in this class of cases has no application to the case in hand."

The majority regard the doctrine there enunciated as repudiated by the later case of *Scott* v. *People*, 141 Ill. 195. This seems to be a misapprehension. That prosecution was for an attempt to produce an abortion and was against the father of the unborn child. Evidence was admitted tending to show that he had made what the defense regarded as three separate attempts to remove the same fœtus. It was urged that it was improper to receive evidence of more than one attempt. This court, in disposing of this assignment, said: "Third, it is assigned as error that there was an improper admission of testimony. It is said that the court admitted testimony as to three distinct felonies. We think that the second and fourth counts charge but one offense. The same offense may be set out in several counts in different language. It is said that the use of the instruments on or about October 15 was one attempt and the use of them twice in the middle of November constituted two other attempts, and that proof of three different attempts was thus allowed to come in. Upon a careful examination of the record we find the defendant's counsel allowed evidence of the use of the instruments at three different times to be admitted without objection; nor do we find that any motion was made to exclude any part of this testimony, nor was the court asked to put the People to their election. But we think the testimony was competent. Acts of the defendant tending to show his knowledge of a woman's pregnancy and his intention to commit an abortion upon her may be proved whether they were prior or subsequent to the particular act charged in the indictment. The three acts proven in this case were not unconnected but were parts of one transaction. They all together constituted but one attempt to procure the same

2 3 6—35

abortion. 'Where several felonies are connected together and form part of one entire transaction, then the one is evidence of the character of the other.' (*Lamb* v. *State,* 66 Md. 287.) 'Whether it [the evidence] was of acts which formed part of the principal transaction, or of acts of the defendant at other times, it tended to prove attempts of the defendant to procure the identical result, the intent to procure which constituted the gist of the offense charged.'—*Commonwealth* v. *Corbin,* 136 Mass. 430."

The evidence was there held to be competent because "the three acts proven in this case were not unconnected but were parts of one transaction. They all together constituted but one attempt to procure the same abortion." How can it be said that this holding repudiates the doctrine of the *Baker case,* when that doctrine is not mentioned, when the *Baker case* is not alluded to, and when there is nothing whatever in the later case inconsistent with the earlier case or the doctrine thereof, and how can it be said that the *Scott case* justifies the admission of evidence tending to show that the accused has committed criminal abortions upon women other than the deceased, when that decision is expressly placed upon the ground that the different acts there proven were all part of the same transaction, being designed to produce one and the same abortion? The majority opinion herein is the first departure from the law as stated in *Baker* v. *People, supra.*

It is true that the evidence in the case at bar very strongly indicates the guilt of plaintiff in error. The question for us is not whether she is guilty, but, conceding her guilt, can the judgment be affirmed without destroying one of the safeguards heretofore deemed necessary and proper in this State for the protection of persons charged with crime? To this the only answer must be a negative. If in every case where a revolting crime, such as this, has been committed, and where the evidence strongly indicates the guilt of the accused, we disregard a salutary rule adopted

to prevent the conviction of innocent persons in order that affirmance may be had, this court will, in effect, become a court of first instance instead of a court of review, and our decisions will depend, not upon the question whether prejudicial error has intervened and whether the prisoner has enjoyed the fair and impartial trial guaranteed by the law, but upon our own conclusions in reference to the sufficiency of the evidence to show guilt.

It is highly important that the guilty be punished, but it is far more important that barriers erected by the law and designed for the protection of the innocent should not be broken down by this court, even for the purpose of affirming the conviction of a person who appears from the evidence to be guilty. Laws established to prevent the conviction of innocent persons are not to be disregarded by us merely because we may believe, upon a consideration of all the evidence, that the accused in any particular case is guilty.

It is true, as a general proposition, that where it appears from the evidence, beyond all reasonable doubt, that the prisoner was guilty and that an error occurring in the trial court was harmless, there should be no reversal. Error, where shown, however, is presumed harmful, and the burden is then upon the party seeking to avoid its effect to show that no injury resulted therefrom. In this particular case, even conceding the guilt of the accused, it can not be said that the improper evidence was harmless. The jury could have fixed the defendant's term of imprisonment at any period not less than fourteen years. They did fix it at twenty years. Can it be doubted that the testimony wrongfully admitted, tending to show that she was an old and hardened offender, who had repeatedly violated this particular law, added to the length of the sentence?

In *Farris* v. *People*, 129 Ill. 521, a prosecution for murder, incompetent evidence calculated to arouse the passions

and inflame the minds of the jury to the prejudice of the defendant was admitted, and in answer to the contention that the error was harmless this court said (p. 533): "It is suggested, and pressed by way of argument, that although the trial court may have erred in allowing this proof, yet, the case being so clearly made out by other evidence and the defense so utterly futile, the error should be held harmless. If the only punishment for the crime of murder in this State was death, the point would be entitled to weight. If it was within the province of the court to assume that the jury would have inflicted the death penalty because the proof of guilt justified it, or if our decision was to affect this case alone, we might hesitate to order a reversal on this theory. The legislature has seen fit to clothe juries with a wide discretion in fixing the punishment to be inflicted upon one convicted of murder. Every defendant on trial for that crime is entitled to the full benefit of the statute. When all else has failed him he has a right to stand before a jury unprejudiced by incompetent, irrelevant evidence, and appeal to them to spare his life. It is impossible for us to know what the jury in this case would have done but for the introduction of this incompetent evidence, much less is it our province to say what they should have done, and no opinion is expressed on that subject. We can only judge of the influence of such testimony upon the minds of the jury by experience and observation common to us all. Here was proof of a distinct felony,— the disgusting and abhorrent facts attendant upon the commission of that most brutal and infamous crime given in detail. No one need be told that from that moment, if the evidence was believed, all feeling of commiseration and mercy toward the defendant must have fled the minds of the jury. There was left for him no possible escape from the death penalty. But aside from all these considerations, we are required to settle a rule of evidence in criminal trials, not merely with reference to this case, but in con-

sideration of future consequences and other rights, and we cannot, from that consideration alone, hesitate to hold that there was such manifest and prejudicial error in the admission of evidence by the trial court in this case as must work a reversal of its judgment."

The majority opinion escapes the effect of this forceful reasoning only by overruling a decision which has stood unquestioned as the law of this State since 1883. Such a radical course should not, in my judgment, be taken merely to avoid a reversal of this judgment and a re-trial of the prisoner. *Baker* v. *People, supra,* which has been approved in *Bishop* v. *People,* 194 Ill. 365, and in *Schultz* v. *People,* 210 id. 196, should be followed instead. Moreover, this case is akin to the *Farris case* in another respect. The evidence in question was wholly and entirely unnecessary, and that being true, as was said in the case just referred to, "it may well be doubted whether testimony so strongly calculated to prejudice the jury against the defendant should have been admitted even though it tended to prove a motive, such proof not being necessary to the case."

The insistence of the prosecutor that proof of previous unlawful abortions produced by the accused was necessary for the purpose of showing that the abortion in question was not committed as necessary for the preservation of the mother's life was apparently a mere subterfuge, made use of for the purpose of introducing incompetent proof that would seriously prejudice the cause of the accused. The evidence showed plainly that the deceased was a strong woman and in good health when she placed herself in the hands of plaintiff in error. She had previously borne three children. The three physicians who conducted the *post mortem* testified that it was not necessary to cause her to abort or miscarry in order to save her life. This established the fact that the abortion was not necessary for the preservation of the life of the mother, which is all that is necessary to satisfy the statute in that regard, *(Beasley* v.

*People,* 89 Ill. 571,) and as it was not contended on the part of the defense that any such necessity existed, but, on the other hand, that the accused had not committed the abortion for any purpose, there was no reasonable excuse for the admission of this highly prejudicial evidence to negative the exception contained in the statute, even had such evidence not been otherwise objectionable.

There is set out in the majority opinion the greater part of a dying declaration made by Marie Hecht, deceased, which was admitted in evidence, and which tended to show that her death was caused by an abortion committed upon her by plaintiff in error. The first portion of the statement so admitted was in the words following: "I, Marie Hecht, now lying dangerously ill at the St. Elizabeth's Hospital, and believing I am about to die, make this, my ante-mortem statement." These words immediately preceded the language which is found in the majority opinion and which is there quoted from the same declaration. The admission of the statement is justified by the majority on the theory that plaintiff in error made no denial of the truth thereof when it was read in her presence at the time it was signed by Marie Hecht. In addition to a general objection to the admission of this dying declaration, the plaintiff in error, after the declaration was admitted in evidence, moved to strike out the portion thereof which I have quoted, and this motion was denied. I think it was improper to admit the dying declaration for any purpose, but, in any event, the portion thereof at which the motion was aimed should not have gone to the jury. It was undoubtedly regarded by the jury as adding weight to the declaration, and it does not remove this difficulty that the jury may have been otherwise advised by proof that Marie Hecht was, at the time of making the statement, near unto death. The words just quoted were particularly prejudicial, because the jury were thereby informed that the statement was made by Marie Hecht when she knew that she was confronted by certain

and immediate death; and they would be more inclined to regard her statement as true than they would if it did not appear to them that she knew she was about to die at the time she made it. It cannot be contended that these words had anything to do with any implied admission made by the plaintiff in error, or that they threw any light upon or gave any force or significance to her silence at the time she heard the declaration read.

I am also of opinion that the sixteenth and seventeenth instructions given at the request of the People were fatally defective, and that the words of the prosecutor in cross-examination and his remarks in argument were of that intemperate and improper character which forbids affirmance.

The judgment should be reversed and the cause remanded for a new trial.

FARMER and VICKERS, JJ.: We concur in the foregoing dissenting opinion of Mr. Justice SCOTT.